ORLANDO FLORES, demandante y recurrente, *v.* MEYERS BROS. OF P.R., INC., demandada y recurrida; ADMINISTRACIÓN DE SERVICIOS AL CONSUMIDOR, interventora y recurrente; HÉCTOR L. SCHMIDT, ETC., demandante y recurrente, *v.* MEYERS BROS. OF PUERTO RICO, demandada y recurrida; HÉCTOR L. SCHMIDT, ETC., demandante y recurrente *v.* MEYERS BROS. OF P.R., INC., demandada y recurrida; HÉCTOR L. SCHMIDT, ETC., demandante y recurrente, *v.* FIRST NATIONAL MAINTENANCE CORP., demandada y recurrida.

*Números*: O-72-84, O-72-203, O-72-210, O-72-211      *Resuelto*: 10 de octubre de 1973

*Juan B. Pérez Cruz,* abogado del recurrente; *Hartzell, Ydrach, Mellado, Santiago, Pérez & Novas,* abogados de la recurrida; *Gilberto Gierbolini, Procurador General, Adolfo J. Vilá, Procurador General Auxiliar* y *Tadeo Negrón Medero,* abogados de la interventora.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

El caso de *Orlando Flores* v. *Meyers Brothers of Puerto Rico, Inc.* fue consolidado con los otros tres casos de epígrafe. Discutiremos el de *Flores* y al final dispondremos lo pertinente sobre los otros tres.

El demandante Orlando Flores tenía, a la fecha de los hechos, oficinas ubicadas en el edificio Pan American, en Hato Rey, Puerto Rico. La codemandada Meyers Brothers of

Puerto Rico, Inc., operaba para esa fecha en dicho edificio un negocio de estacionamiento de vehículos de motor. El demandante, mediante paga, utilizó los servicios de estacionamiento de Meyers para aparcar allí su automóvil. Lo cerró y retuvo las llaves del mismo.

Al regresar a buscar su carro, Flores encontró que le habían roto un cristal lateral y le habían hurtado un tocacintas que tenía instalado en su carro y un número de cintas magnetofónicas. Flores informó lo ocurrido al encargado del negocio de aparcamiento y a la Administración de Servicios al Consumidor. Meyers negó tener responsabilidad civil. Flores demandó a Meyers en el Tribunal de Distrito, Sala de Río Piedras, y la Administración de Servicios al Consumidor solicitó y obtuvo permiso para intervenir en el caso.

Visto el caso en su fondo en el Tribunal de Distrito, éste encontró probado, en esencia, lo antes relatado, declaró la demanda con lugar y condenó a la demandada a pagarle a Flores $167.00, suma que incluía los daños causados al vehículo y el valor del tocacintas. También concedió una modesta suma para honorarios de abogado. No concedió cantidad alguna por las cintas hurtadas.

■ Acertadamente se dirigió el Tribunal de Distrito a nuestro derecho positivo vigente entonces, para buscar la solución al problema que ante sí tenía. Dicho derecho escrito lo constituía la Ley Núm. 107 de 27 de junio de 1964, la cual autorizaba al Administrador de Estabilización Económica a reglamentar el negocio de estacionamiento de vehículos de motor, 23 L.P.R.A. secs. 801 y ss. Dicha Ley Núm. 107 era la aplicable porque los hechos que motivaron este pleito ocurrieron el 5 de marzo de 1969 y esa ley, como dijimos, data del año 1964 y estaba en vigor.[1] Como nuestra jurisdicción es una de Derecho Civil, cuando hay

---

[1] La nueva y vigente ley que regula el negocio de estacionamiento de vehículos de motor es la Ley Núm. 120 de 7 de junio de 1973 (23 L.P.R.A. secs. 805 y ss.), la cual derogó la antes mencionada Ley Núm. 107.

derecho legislado a él hay que recurrir en primer lugar y como fuente principal para la solución de los casos. La jurisprudencia puede ser interpretativa cuando es legítimamente necesario interpretar y puede ser supletoria cuando es indispensable suplir, pero no es sustitutiva del derecho positivo. Es prácticamente universal en las jurisdicciones de derecho civil la disposición contenida en el Art. 7 de nuestro Código Civil en el sentido de que *"cuando no haya ley aplicable al caso"* el tribunal resolverá conforme a equidad, teniendo en cuenta la razón natural, los principios generales del derecho y los usos y costumbres aceptados y establecidos. (Bastardillas nuestras). (²)

Es sabido que en el mundo del Derecho Civil la ley escrita ocupa el primer rango entre las fuentes formales del Derecho. "[H]emos de reconocer," escribe Castán, "que la ley, como expresión de una voluntad social de alcance obligatorio y general, tiene superior fuerza vinculante que la jurisprudencia." (³) Sobre el particular se expresa Rene David, como sigue: "Tal punto de vista se adapta al principio democrático y se justifica, además, por el hecho de que los organismos estatales y administrativos están mejor situados que cualquier otro para coordinar los diversos sectores de la vida social y apreciar cuál es el interés común. Finalmente, la ley, debido a su precisión de expresión, se presenta como la técnica más perfecta cuando se trata de enunciar normas claras, en una época en que la complejidad de las relaciones sociales exige, entre los elementos de una solución justa, la precisión y la claridad." (⁴)

---

(²) Como se sabe, cuando nuestros códigos hablan de "equidad," no quieren decir *equity;* y cuando hablan de "derecho común" como supletorio al derecho escrito, no quieren decir *common law* sino el derecho común civil. Véase *Vda. de Ruiz* v. *Registrador,* 93 D.P.R. 914 (1967), a la pág. 940, escolio 12.

(³) *La Formulación Judicial del Derecho,* 2da. ed. (1954), pág. 144.

(⁴) *Los Grandes Sistemas Jurídicos Contemporáneos,* ed. española de 1969, pág. 84.

Aún Francois Geny, el brillante paladín del método de la investigación libre del derecho y uno de los grandes líderes de la revolución que irrumpió en el derecho occidental a fines del siglo XIX y principios del XX contra el positivismo exagerado que había prevalecido por casi un siglo, reconoció la primacía del derecho escrito. (5)

En el derecho común anglosajón la situación no es distinta. Ya en el siglo XVII Sir Edward Coke, figura señera por excelencia del *common law* escribía "Ningún precedente judicial puede prevalecer sobre una ley del Parlamento." (6) (*"No precedent can prevail against an act of Parliament."*) Hoy día, en cualquier jurisdicción del derecho común anglosajón los tribunales aplican el derecho escrito, esto es, legislado, cuando este existe. El Profesor J. H. Merryman escribe: "Igualmente que en los países de derecho civil, en los Estados Unidos la legislación legítimamente decretada constituye la

---

(5) Véase A. Hernández Gil, *Metodología del Derecho* (1945), pág. 216; Castán, *Teoría de la Aplicación e Interpretación del Derecho* (1947), págs. 133 y 155.

Para una buena discusión del movimiento que propuso, y logró, la revisión de los métodos tradicionales dando entrada en la elaboración del derecho a factores sociológicos y teleológicos, pueden verse los capítulos V al VIII de la obra de Hernández Gil antes mencionada. También la de Castán citada en este escolio, págs. 101–151. En idioma inglés, probablemente el mejor compendio es la obra *Legal Theory* de W. Friedmann, 4ta. ed. (1960); 5ta. ed. (1967). En los Estados Unidos, los escritos del decano Pound y del Juez Cardozo, entre otros, son ejemplos de las posturas sociológica y teleológica.

(6) Citado en Bowen, *The Lion and the Throne* (1956), pág. 376. Edward Coke, abogado, Procurador General, Juez Presidente, Privy Councilor, legislador, coautor a los 76 años de la "Petition of Right" (1628), documento libertario modelo e inspiración de los padres de la República Estadounidense, se inmortalizó más que nada por su defensa del imperio de la ley frente a los monarcas Estuardos.

A propósito de que figuramos entre las jurisdicciones de derecho civil, no está de más recordar que ese patriarca del derecho común anglosajón escribió que los romanos podían "justamente" vanagloriarse de su derecho. Bowen, *The Lion and the Throne* (1956), pág. 65. Para una narración extraordinaria de una vida y una época extraordinarias, véase esa biografía de Coke.

ley, la cual se espera que los jueces interpreten y apliquen con el mismo espíritu con que fue creada." (⁷)

Pound, refiriéndose a la legislación como fuente de derecho, escribe: "Es la manera característica de formular el derecho en las sociedades maduras." (⁸) (*"It is the characteristic mode of lawmaking in matured societies."*) El mismo autor también expresa que "los esfuerzos para reformar el derecho mediante la casuística no son adecuado sustituto de una bien redactada legislación." (⁹) Finalmente, el Tribunal Supremo de los Estados Unidos ha expresado que en la jurisdicción federal el Congreso, dentro de su ámbito constitucional, tiene la última palabra sobre las cuestiones de política pública. *Railway Employees Department, A.F.L.* v. *Hanson,* 351 U.S. 225, 234 (1956). Existiendo, como existía, a la fecha de los hechos del caso de autos legislación sobre el negocio de aparcamiento, a ella había que recurrir en primer lugar. (¹⁰)

De la decisión del Tribunal de Distrito la demandada apeló para el Tribunal Superior, Sala de San Juan, y éste mediante su sentencia de 11 de febrero de 1972 revocó la del Tribunal de Distrito y declaró sin lugar la demanda. Expedimos *certiorari* para revisar.

---

(⁷) *The Civil Law Tradition* (1969) pág. 27.

(⁸) *The Formative Era of American Law* (1938), pág. 71.

(⁹) *Jurisprudence* (1959), Vol. III, pág. 738.
Sobre la generalidad de la ley escrita y la particularidad de la jurisprudencia véase del prestigioso comparativista francés Rene David, su *French Law, Its Structure, Sources and Methodology* (1972) págs. 76–83, y a W. Friedmann, *Legal Theory,* 5ta. ed. (1967), págs. 533–543; en la 4ta. ed. (1960) págs. 483–493. También hay una discusión de interés sobre esto en G. W. Paton, *Jurisprudence,* 4ta. ed. (1972), págs. 243–258.

(¹⁰) Justo es aclarar que cuando ocurrieron los hechos que dieron motivo a los casos de *Rivera* v. *San Juan Racing Assoc., Inc.,* 90 D.P.R. 414 (1964) y *Dávila* v. *International Parking Co.,* 91 D.P.R. 203 (1964) todavía no se había aprobado la Ley Núm. 107 de 27 de junio de 1964, de manera que no había derecho positivo expreso para aquellas situaciones particulares y el Tribunal suplió aquella laguna. Ya esa no es la situación.

Los peticionarios señalan los siguientes cinco errores: Incidió el Tribunal Superior

1. "Al resolver que la Sección 5, del Reglamento Operacional Núm. 1, que regula las áreas de estacionamiento público en Puerto Rico, promulgado por la Administración de Servicios al Consumidor, bajo la facultad que le confiere la Ley Núm. 107 del 27 de junio de 1964 (23 L.P.R.A. 801–804) y la Ley Núm. 228 del 14 de mayo de 1942 (23 L.P.R.A. 731–746), es nula y no puede aplicarse a los hechos envueltos en el caso de referencia."

2. "Al resolver que lo resuelto por este Honorable Tribunal en los casos de Rivera Vs. San Juan Racing Association, Inc., 90 D.P.R. 414; y Dávila vs. International Parking Company, 91 D.P.R. 203, son de aplicación a los hechos envueltos en el caso que motiva la presente Solicitud."

3. "Al resolver que el demandante recurrente no tiene derecho a reclamar indemnización por el robo del tocacintas instalado en su automóvil."

4. "Al resolver que bajo la Ley 107 del 27 de junio de 1964 (23 L.P.R.A. 801–804) el demandante-recurrente no tiene derecho a ser resarcido en daños y perjuicios por la demandada-recurrida."

5. "Al resolver que lo celebrado entre el demandante apelado-recurrente y la demandada-apelante-recurrida es un contrato de arrendamiento de espacio para estacionar."

Las cuestiones centrales de este caso son las siguientes: (1) ¿Qué clase de contrato existía entre el demandante y la demandada? ¿Arrendamiento? ¿Depósito? ¿O es un contrato distinto a los antes mencionados, el cual tiene sus propios fines y sus propias características? (2) Una vez contestado lo anterior, ¿hay responsabilidad civil de parte de la demandada? Y, en caso afirmativo, ¿hasta qué límite? Vamos a tratar a continuación la primera de estas dos cuestiones.

El contrato de aparcamiento de vehículos de motor ya no es un contrato raro y poco usual como lo pudo haber sido en épocas pasadas. Hoy día es un contrato tan común y corriente como lo son los de compraventa, permuta, arrendamiento, mandato y otros que menciona el Código Civil. Es un contrato

tan frecuente que puede afirmarse que en efecto es un contrato típico de la sociedad contemporánea. Se realiza miles de veces diariamente en todas las ciudades del mundo. En Puerto Rico, por ejemplo, con cientos de miles de vehículos de motor en movimiento todos los días en las zonas urbanas, es claro que se celebran muchos miles de esos contratos al día.

Precisamente, en parte, por lo que dejamos dicho—lo numeroso y corriente que es dicho contrato—el mismo ha preocupado a las autoridades de Puerto Rico por un tiempo considerable. Ya hace doce años, en diciembre de 1961, la Administración de Estabilización Económica de Puerto Rico hizo un estudio de la situación que esos contratos planteaba y preparó un Informe sobre El Negocio de Areas de Estacionamiento. En base de dicho estudio el mencionado organismo público emitió su Reglamento de Precios Núm. 16 titulado "Fijación de Tarifa Máxima para el Servicio de Estacionamiento de Vehículos de Motor en Puerto Rico."

En abril de 1963 el Senado de Puerto Rico, mediante su Resolución Núm. 40, ordenó a su Comisión de Industria y Comercio que estudiase el negocio de aparcamiento en Puerto Rico. En dicha resolución el Senado, entre otras cosas, ordenó que se estudiase la responsabilidad de los operadores de dichos negocios en casos de daños a los *vehículos* de los usuarios y en casos de *hurtos de pertenencias* dejadas en los vehículos por éstos.

La Comisión hizo el estudio encomendádole y rindió su Informe al Senado el 3 de marzo de 1964. *Diario de Sesiones,* Vol. 18, pág. 424. Concluyó, en síntesis, que las tarifas fijadas por el Administrador de Estabilización Económica y por el Municipio de San Juan([11]) constituían, a la fecha, suficiente protección al público, y que no existía un control monopolístico de dicho negocio. En cuanto a la responsabilidad civil de los

---

([11]) Ordenanza Núm. 25, Serie 1963–64, fijando tarifas en los terrenos propiedad del Municipio arrendados a particulares para ser explotados como áreas de estacionamiento.

operadores de negocios de estacionamiento la Comisión se limitó a reproducir el texto de un estudio que sobre el particular encargó a los abogados de la Asamblea Legislativa. En dicho estudio se concluía, en síntesis, que el Tribunal Supremo del país no había tenido ocasión de pronunciarse sobre el particular; que era probable que al hacerlo asimilase la situación a la del contrato de depósito; y que por ello no parecía necesario legislar sobre el particular. Evidentemente la Asamblea Legislativa no fue de ese parecer pues, como veremos, legisló sobre el asunto.

En la sesión ordinaria de aquel año se presentó el Proyecto del Senado Núm. 606, el cual se convirtió en la Ley Núm. 107 de 27 de junio de 1964, antes citada. Dicha ley consta de una Exposición de Motivos y cinco artículos. Su artículo quinto le da vigencia inmediata. En su Exposición de Motivos se expresa, en parte, que debido a las condiciones bajo las cuales operan los negocios de estacionamiento de vehículos, es conveniente que en protección del interés público sean reglamentados, no solo en cuanto a las tarifas sino también en cuanto a las condiciones de seguridad y a la prestación de las debidas garantías, mediante seguro o en otra forma adecuada, para el resarcimiento de los daños que se ocasionen a los usuarios, *a sus vehículos* y a *las pertenencias en ellos dejadas.*

En su artículo primero la ley confirió al Administrador de Estabilización Económica "plenas facultades" para reglamentar los negocios de estacionamiento de vehículos de motor. En su artículo segundo se confieren una serie de facultades, "pero sin que ello constituya una limitación," entre las cuales están las de fijación de tarifas, la expedición de licencias a los operadores de esos negocios, la exigencia de normas mínimas de seguridad, la prestación de garantías mediante seguro o en otra forma adecuada, para el resarcimiento de los daños que puedan sufrir las personas y sus *vehículos.* Añade dicho artículo que el mismo no da facultad al Administrador para

imponer a los operadores de dichos negocios una responsabilidad en daños "en adición a, o en exceso de la responsabilidad que a tales efectos les impongan las leyes de Puerto Rico." La ley no elabora sobre ese particular pero podemos entender que sí, como en el caso de autos, el demandante obtiene resarcimiento mediante demanda en acción civil en los tribunales, el Administrador no podrá imponer una responsabilidad en adición o en exceso de la concedida por el tribunal.

En su artículo tercero dispone que la Ley Núm. 228 de 12 de mayo de 1942, la "Ley Insular de Suministros," según enmendada, se considerará en lo aplicable supletoria de dicha Ley Núm. 107.

En su artículo cuarto la Ley Núm. 107 que venimos reseñando, dispuso que la misma no es aplicable a los solares y locales de estacionamiento de vehículos de motor que sean operados sin ánimo directo de lucro, esto es, que sean operados como un servicio para clientes y parroquianos de un determinado negocio. Esta cláusula parece de justicia. La ley no impone deberes onerosos a los operadores de lugares en los cuales el aparcamiento es gratis, pero sí impone, en el interés público, deberes a los operadores que explotan con fin lucrativo, lugares de aparcamiento.

El Reglamento, promulgado bajo autoridad de ley— Artículo 1 de la Ley Núm. 107—precisa aún más las características del contrato de aparcamiento. Contiene definiciones, dispone lo relativo a las licencias, reglamenta sobre las condiciones físicas de dichos negocios, sobre lo relativo a los seguros, etc. Véase 23 R.&R.P.R. secs. 801–1 a la 801–11. ([12])

De todo lo anterior puede verse que de lo que se trata es realmente de un contrato de aparcamiento. Quien conduce su vehículo a un lugar de aparcamiento no lleva en mente hacer una operación de bienes raíces. No lleva en mente efectuar un

---

([12]) La vigente ley es mucho más completa que la anterior. Provee además para multas administrativas, para vistas administrativas y para revisión judicial.

arrendamiento de inmueble. Lo que lleva en mente es conseguir un lugar en donde dejar su automóvil, mediante el pago de una suma, donde el mismo quede aparcado y vigilado mientras su dueño va al cine, al médico, de compras o a realizar cualquier otra gestión. El dueño de un vehículo paga porque su automóvil quede así estacionado y vigilado en vez de dejarlo en la calle sujeto a los riesgos de vandalismo y de hurto que hoy día existen.

■ De manera que el contrato que nos ocupa es uno sinalagmático, principal (como lo son el de compraventa y el de permuta), y no uno accesorio pues no existe por consecuencia de ninguno otro (como en los casos de la fianza, la prenda y la hipoteca). Es un contrato nominado—contrato de aparcamiento o de estacionamiento—tiene individualidad propia y reglas especiales en la ley y en los reglamentos. ([13]) Como se ha indicado, lo regía, a la fecha de los hechos del caso de autos, la antes mencionada Ley Núm. 107 y su Reglamento, 23 R.&R.P.R. secs. 801–1 a la 801–11. Es cierto que anteriormente, mediante opinión emitida por una Sala de tres Jueces, expresamos criterios distintos, pero, como ya hemos señalado, dicho caso se resolvió antes de existir la Ley Núm. 107 de 27 de junio de 1964. En aquella opinión se reconoce expresamente a la pág. 425, que se fallaba el caso en ausencia de ley aplicable. ([14])

■ No tenemos duda de que un tocacintas diseñado para ser instalado en un automóvil y así instalado, como lo estaba el del caso de autos, así como un radio, espejos, tapabocinas, antenas, equipo de aire acondicionado, instalados en un vehículo, el neumático de repuesto y las herramientas del automóvil son accesorios del vehículo y estaban cubiertos por la Sec. 5 del reglamento original, al éste disponer que "El operador será responsable del hurto o robo del vehículo y sus

---

([13]) Véase, Castán, *Derecho Civil Español, Común y Foral*, Tomo 3, 10ma. ed. (1967), págs. 388–389.

([14]) *Rivera* v. *San Juan Racing Assoc., Inc.*, 90 D.P.R. 414 (1964).

accesorios así como de los daños que sufra el vehículo en su exterior." También están cubiertos dichos accesorios por el reglamento vigente.

Para la protección del operador del negocio disponía también la Sec. 5 del reglamento original lo siguiente:

"En caso de hurto o daño a los artículos u objetos personales que estén dentro del vehículo, será responsable únicamente si el usuario le hubiere entregado la llave o llaves del vehículo y éste las hubiere aceptado, quedando el operador autorizado a inspeccionar tales artículos u objetos personales juntamente con el usuario para determinar la naturaleza y valor de los mismos. El usuario debe notificar al operador la cantidad, naturaleza y valor de los artículos u objetos personales contenidos en el interior del vehículo."

Una disposición similar contiene el reglamento vigente. Véase 23 R.&R.P.R. sec. 801-6. No vemos razón alguna por la cual las citadas disposiciones del reglamento sean nulas. Son disposiciones promulgadas en virtud de una delegación válida y expresa de la ley. Art. 1 de la Ley Núm. 107. Ante las complejidades de la vida moderna, urbana e industrial, los cuerpos legislativos se ven obligados a conferir amplias delegaciones del poder de reglamentación a los organismos administrativos. Se sostienen los reglamentos que, cumpliendo con el debido proceso de ley, tengan el propósito de realizar los propósitos para los cuales fue creado el organismo administrativo. *Permian Basin Area Rate Cases*, 390 U.S. 747, a la pág. 780 (1967). También véanse *United States* v. *Southwestern Cable Co.*, 392 U.S. 157 (1968) ; *American Trucking Associations, Inc.* v. *Atchison, Topeka & Santa Fe Railway Co.*, 387 U.S. 397 (1967). Además, Davis, *Administrative Law Treatise*, 1970 Supplement, Secs. 2.00 a la 2.17.

No tenemos motivos para intervenir con la adjudicación de daños que hizo el Tribunal de Distrito, los cuales suman $167.00. Nos parecen razonables.

En vista de lo anterior, concluimos que se cometieron los errores señalados; *se revocará la sentencia dictada por*

*el Tribunal Superior, Sala de San Juan en este caso, el 11 de febrero de 1972 y se confirmará la dictada por el Tribunal de Distrito, Sala de Río Piedras, en 2 de marzo de 1970.*

En el caso de autos (el de Flores) se practicó prueba. No así en los otros casos consolidados con éste. Estos últimos se resolvieron a base de cuestiones de derecho. En cuanto a dichos casos consolidados con el de autos, esos se devolverán al tribunal de primera instancia para que se practique prueba, se hagan conclusiones de hecho y de derecho, se valúen los daños si los hubiese, o se hagan las estipulaciones que acuerden las partes y se decidan a tenor con la prueba o las estipulaciones y con lo aquí resuelto. A dichos casos se les aplica la Ley Núm. 107 de 27 de junio de 1964, antes citada, 23 L.P.R.A. secs. 801 y ss., y su Reglamento, 23 R.&R.P.R. secs. 801-1 y ss.

En cuanto a los casos surgidos con posterioridad al 7 de junio de 1973, a éstos se les aplicará la nueva ley, vigente en la actualidad, Ley Núm. 120 de esa fecha (23 L.P.R.A. secs. 805 y ss.) y su Reglamento.

El Juez Presidente, Señor Pérez Pimentel, y los Jueces Asociados, Señores Dávila y Martínez Muñoz, concurren en el resultado sin opinión. El Juez Asociado, Señor Cadilla Ginorio, no intervino.